IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROADSAFE TRAFFIC SYSTEMS, INC. and ROADSAFE HOLDINGS, INC., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civ. No. 09-148-SLR ) |
| AMERISEAL NORTHEAST FLORIDA, INC., AMERISEAL HIGHWAY STRIPING, INC., AMERISEAL CRACK & JOINT SEALING, LLC, and MELVIN O. CARTER, | ) ) ) ) ) |
| Defendants. | ) ) |
| MELVIN O. CARTER, AMERISEAL NORTHEAST FLORIDA, INC., AMERISEAL HIGHWAY STRIPING, INC., and AMERISEAL CRACK & JOINT SEALING, LLC, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civ. No. 10-028-SLR ) |
| ROADSAFE TRAFFIC SYSTEMS, INC. and ROADSAFE HOLDINGS, INC., | ) ) ) |
| Defendants. | ) ) ) |

Elizabeth A. Sloan, Esquire of Blank Rome LLP, Wilmington, Delaware.  Counsel for RoadSafe Traffic Systems, Inc. and RoadSafe Holdings, Inc.  Of Counsel: Daniel E. Traver, Esquire and F. Ryan Waters, Esquire of GrayRobinson, P.A.

Thad J. Bracegirdle, Esquire of Wilks, Lukoff & Bracegirdle, LLC, Wilmington, Delaware.  Counsel for Ameriseal Northeast Florida, Inc., Ameriseal Highway Striping, Inc., Ameriseal Crack & Joint Sealing, LLC and Melvin O. Carter.  Of Counsel: Douglas Bradford Hughes, Esquire of D. Brad Hughes, P.A.

**OPINION**

Dated: September ℳ, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Ameriseal Northeast Florida, Inc. ("Ameriseal Northeast"), Ameriseal Highway Striping, Inc. ("Ameriseal Highway Striping"), Ameriseal Crack & Joint Sealing, LLC ("Ameriseal C&J") (collectively, "Ameriseal") and Melvin O. Carter ("Carter;" together with Ameriseal, "the Ameriseal defendants") filed an action for fraud and breach of contract against RoadSafe Traffic Systems, Inc. and RoadSafe Holdings, Inc. (together, "RoadSafe") in the Circuit Court, Seventh Judicial Circuit in and for St. Johns County, Florida on February 27, 2009 ("the Florida action").  (Civ. No. 10-028,[1] D.I. 1) RoadSafe filed a complaint against the Ameriseal defendants in this court on March 5, 2009, alleging causes of action for fraud, negligent misrepresentation, breaches of representations and warranties, conversion, and breach of contract.[2]  (D.I. 1) RoadSafe filed its amended complaint on April 24, 2009, adding causes of action for breach of contract and the duty of good faith and fair dealing, unjust enrichment, and account stated against Ameriseal Northeast and Ameriseal C&J, specifically.  (D.I. 20 at ¶¶ 92-115)  On January 13, 2010, the Florida action was transferred to this court.  (Civ. No. 10-028, D.I. 42)  A bench trial was held from January 18 to January 20, 2011.  (D.I. 90-92)  This court has jurisdiction pursuant to 28 U.S.C. § 1332.  Having considered the documentary evidence and the testimony, the court makes the following findings of fact

---

[1]Unless otherwise noted, docket entry citations refer to Civil Action No. 09-148.

[2]RoadSafe's original and amended complaints also alleged causes of action for negligent misrepresentation against Masters, Smith & Wisby, P.A. and Baker & Associates, Inc.  (D.I. 1 at ¶¶ 87-104; D.I. 20 at ¶¶ 116-137)  Because defendant Masters, Smith & Wisby, P.A. was terminated as a party on April 28, 2010 and defendant Baker & Associates, Inc. was terminated as a party on January 4, 2011, the court need not address these causes of action.

and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. The Parties

1. RoadSafe Traffic Systems, Inc. and RoadSafe Holdings, Inc. are Delaware corporations headquartered in Bensalem, Pennsylvania. (D.I. 91 at 55:14) RoadSafe is the second largest provider of traffic safety equipment and traffic safety services in the United States. (D.I. 91 at 55:5-12)

2. Ameriseal Northeast is a Florida corporation with its principal place of business in St. Johns, Florida. (D.I. 79 at 4) Ameriseal Northeast was founded by Carter in 1989 and provides highway striping and marking services primarily for the Florida Department of Transportation. (D.I. 92 at 88:24-90:3)

3. Ameriseal Highway Striping is a Florida corporation with its principal place of business in St. Johns, Florida. (D.I. 79 at 4) Ameriseal Highway Striping was founded by Carter in 2002 and provides subcontracting services for prime contractors such as Ameriseal Northeast. (D.I. 92 at 91:2-12)

4. Ameriseal C&J is a Florida limited liability company with its principal place of business in St. Johns, Florida. (D.I. 79 at 4) Ameriseal C&J performs joint sealing work on concrete, runway aprons and bridge decks, and was purchased by Carter in 2005. (D.I. 92 at 95:2-17)

5. Carter is a Florida resident who is the founder and sole shareholder of Ameriseal Northeast and Ameriseal Highway Striping. (D.I. 79 at 5; D.I. 92 at 89:16 - 91:17) Carter is in charge of developing and maintaining Ameriseal's relationships,

2

preparing and submitting bid packages to the Florida Department of Transportation, hiring employees, purchasing equipment and maintaining contact with Ameriseal's vendors. (D.I. 92 at 90:4 -94:10)

### B. The Equity Purchase Agreement

6. Beginning in 2007, Jerry Baker of Baker & Associates, Inc., a business brokerage firm, presented Carter with opportunities to sell Ameriseal to a potential buyer while remaining actively involved in the companies. (D.I. 92 at 95:18 - 96:16)

7. The Ameriseal defendants entered into a non-binding letter of intent with Highway Technologies, Inc. ("HT") on September 25, 2007. (RoadSafe Ex. 106) Carter stated that, in preparation for a potential sale to HT, he "clean[ed] up [his] books" by personally paying past due invoices to some Ameriseal vendors and entering into a note obligating him to pay for expenses invoiced to Ameriseal. (D.I. 92 at 109:14-22; 113:2 - 114:3)

8. Specifically, on September 11, 2007, Carter and his wife personally cosigned a $1.953 million promissory note on behalf of Ennis Paint, Ameriseal's largest vendor, obligating them to pay for expenses originally invoiced to Ameriseal. (Joint Ex. 24; D.I. 91 at 130:15 - 131:6; D.I. 92 at 113:2-19) Carter also paid Ameriseal vendor Potters Industries, Inc. with a personal check in the amount of $110,921.42 on September 28, 2007, and he instructed his wife to sign personal checks for Ameriseal vendor Ray-O-Lite in the amount of $111,273.00 on October 24, 2007 and for Ennis Paint in the amount of $750,000.00 on December 21, 2007. (Joint Ex. 22, 23; D.I. 92 at 109:18 - 113:1)

9. Carter informed HT about the note and the personal payments he made in an

3

effort to clean up Ameriseal's books. (D.I. 92 at 113:20 - 114:3) Following Carter's disclosure, the deal fell through and HT sent a letter to Carter stating that "the results of HT's due diligence with respect to Ameriseal were unsatisfactory." (*Id.* at 114:4-5; RoadSafe Ex. 106)

10. In March of 2008, Carter notified Masters, Smith & Wisby ("MSW"), the preparer of Ameriseal's audited financial statements, that he had paid business expenses with personal funds. (Joint Ex. 131; D.I. 92 at 129:2-24)

11. On May 28, 2008, Baker & Associates, Inc. issued a report (the "Baker Report") to RoadSafe detailing Ameriseal's historic revenue figures from 1989 through 2007. (RoadSafe Ex. 12) The Baker Report depicted Ameriseal as a company with steady and consistent profitability. (*Id.*; D.I. 91 at 59:8 - 60:9)

12. Following internal meetings and meetings with Carter, a series of telephone calls, and consultations with counsel, RoadSafe signed a non-binding letter of intent to acquire Ameriseal on June 23, 2008. (Joint Ex. 13; D.I. 91 at 60:17 - 67:25) The letter of intent set the purchase price at $17.5 million with $15 million cash and $2.5 million in stock. (Joint Ex. 13)

13. On June 25, 2008, RoadSafe's due diligence accounting firm, Bober, Markey & Fedorovich ("Bober Markey") issued its first due diligence request to Ameriseal, requesting Ameriseal's audited financial statements from 2005, 2006 and 2007, as well as a list of any related party transactions. (Joint Ex. 15; D.I. 91 at 228:17 - 229:16) Two days later, Ameriseal deleted accounting records showing historic details of payments to vendors in 2005 and 2006. (RoadSafe Ex. 10; D.I. 91 at 205:10 - 206:8, 226:23 - 229:18)

14.  Beginning on July 17, 2008, RoadSafe provided the Ameriseal defendants with fifteen drafts of the proposed Equity Purchase Agreement ("EPA"), each of which contained representations and warranties of the accuracy of Ameriseal's financial statements. (Joint Exs. 19, 111-124; D.I. 91 at 78:17 - 84:8)

15.  On August 28, 2008, the Ameriseal defendants and RoadSafe entered into a second letter of intent containing a 30-day exclusivity period and a proposed September 23, 2008 closing date.  (Joint Ex. 17)  The second letter of intent provided for a $16.1 million purchase price with $14.3 million in cash and $1.8 million in stock. (*Id.*)

16.  The transaction did not close on September 23, 2008 as planned due to RoadSafe's inability to obtain financing as a result of changes in the credit market. (D.I. 91 at 95:13-21)

17.  On November 17, 2008, Carter filed a personal tax return, prepared by MSW, deducting the $972,194 paid to Ameriseal vendors with personal checks as a business expense.  (D.I. 79 at 6)  MSW never informed RoadSafe of these payments. (*Id.*)

18.  RoadSafe obtained a loan on January 7, 2009, and the parties signed the EPA the following day.  (Joint Ex. 18; D.I. 91 at 97:21 - 98:4)  The signed version of the EPA provided for a purchase price of $10.3 million in cash and $1.7 million in RoadSafe stock.  (Joint Ex. 18)

19.  From the time Carter met RoadSafe through the time he signed the EPA, Carter never informed RoadSafe about the note or the personal checks he wrote to cover Ameriseal's debt and corporate expenses.  (D.I. 92 at 116:6-13)

20.  On January 16, 2009, RoadSafe received an anonymous text message
stating that "Carter hid 1 million in material costs on the year end fin statement by
paying it himself do u want to see the checks he has altered 2008 records also." (Joint
Ex. 20)  At the time, Carter denied that the allegations were true.  (D.I. 91 at 101:17 -
102:13; D.I. 92 at 119:16 - 121:5)

21.  Following its receipt of the anonymous text message, RoadSafe asked
Bober Markey to perform a forensic accounting analysis of Ameriseal's financials.  (D.I.
91 at 104:12 - 105:2)  Upon the discovery of Carter's personal checks, and after
reviewing the results of Bober Markey's forensic accounting investigation, RoadSafe
terminated the EPA on February 13, 2009.  (Joint Ex. 130; D.I. 91 at 109:25 - 111:7)

### C. Fraudulent and Negligent Misrepresentation

#### 1. Legal standards

22.  To prevail on its claim for fraudulent misrepresentation under Florida law,[3]
RoadSafe must establish four elements: "(1) a false statement concerning a material
fact; (2) the representor's knowledge that the representation is false; (3) an intention
that the representation induce another to act on it; and (4) consequent injury by the
party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105
(Fla. 2010) (quoting *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985) (internal
quotations omitted)).  RoadSafe must prove each element by a preponderance of the
evidence. *See Wieczoreck v. H & H Builders, Inc.*, 475 So. 2d 227, 227-28 (Fla. 1985).

---

[3]The parties agree that Delaware law governs all EPA contract-based claims and
that Florida law governs all remaining claims.  (D.I. 79 at 7)

6

23.  To prevail on its claim for negligent misrepresentation under Florida law,

RoadSafe must meet a similar test by a preponderance of the evidence, with the

exception that RoadSafe need only show that the Ameriseal defendants should have

known that the representation was false.  Specifically, RoadSafe must establish that:

"(1) the defendant made a misrepresentation of material fact that he believed to be true

but which was in fact false; (2) the defendant was negligent in making the statement

because he should have known the representation was false; (3) the defendant

intended to induce the plaintiff to rely on the misrepresentation; and (4) injury resulted

to the plaintiff acting in justifiable reliance upon the misrepresentation."  *Simon v.*

*Celebration Co.*, 883 So. 2d 826, 832 (Fla. Dist. Ct. App. 2004).

### 2.  Discussion[4]

#### a.  Economic loss doctrine

24.  As a preliminary matter, the court addresses the Ameriseal defendants'

contentions that RoadSafe's allegations of fraud and negligent misrepresentation are

barred by the economic loss rule.  The economic loss rule provides that, "[w]here

damages sought in tort are the same as those for breach of contract[,] a plaintiff may

not circumvent the contractual relationship by bringing an action in tort."  *Ginsberg v.*

*Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494 (Fla. Dist. Ct. App. 1994); *see also*

*Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 536 (Fla. 2004).  The

policy underlying the economic loss rule is based on "the assumption that the parties to

---

[4]The Ameriseal defendants voluntarily dismissed their claim for fraud against
RoadSafe.  (D.I. 93 at 33)

a contract have allocated the economic risks of nonperformance through the bargaining process." *Topp, Inc. v. Uniden Am. Corp.*, 513 F. Supp. 2d 1345, 1348 (S.D. Fla. 2007) (citing *Indem. Ins. Co.*, 891 So. 2d at 542). Allowing tort remedies in cases involving a contractual agreement "would threaten to completely eclipse contractual remedies and would undermine the reliability of commercial transactions." *Id.* at 1351.

25. The economic loss rule does not act as a bar to recovery for causes of action based upon torts independent of the contractual breach, even if a cause of action for breach of contract also exists. *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996). This independent tort exception to the economic loss rule includes causes of action for fraud in the inducement and negligent misrepresentation under Florida law. *Id.* ("Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from acts that breached the contract."); *D & M Jupiter, Inc. v. Friedopfer*, 853 So. 2d 485, 487 (Fla. Dist. Ct. App. 2003) ("[T]he economic loss rule does not bar tort actions based on fraudulent inducement and negligent misrepresentation."); *Allen v. Stephan Co.*, 784 So. 2d 456, 457 (Fla. Dist. Ct. App. 2000) ("The law is well established that the economic loss rule does not bar tort actions based on fraudulent inducement and negligent misrepresentation.").

26. Florida courts have explained that fraud in the inducement "presents a special situation where parties to a contract appear to negotiate freely - which normally would constitute grounds for invoking the economic loss doctrine - but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined

8

by the other party's fraudulent behavior." *HTP*, 685 So. 2d at 1240 (quoting *Huron Tool*

*& Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W. 2d 541, 545 (Mich. Ct. App.

1995) (internal quotations omitted)).  Therefore, allowing claims for fraud in the

inducement to go forward upholds the policy rationale underlying claims for fraud:

> [T]he interest protected by fraud is society's need for true factual
> statements in important human relationships, primarily commercial or
> business relationships.  More specifically, the interest protected by fraud
> is a plaintiff's right to justifiably rely on the truth of a defendant's factual
> representation in a situation where an intentional lie would result in loss to
> the plaintiff.  Generally, the plaintiff's loss is a purely economic loss . . .

*Id.* (quoting *Woodson v. Martin*, 663 So. 2d 1327, 1330 (Fla. Dist. Ct. App. 1995)

(Altenbernd, J., dissenting)).

27.  Moreover, allowing both fraud and breach of contract claims to proceed

simultaneously does not thwart the policy underlying the economic loss rule by opening

the door to a double recovery for the same actions.  The Florida Supreme Court has

adopted the following reasoning:

> [O]ne who has been fraudulently induced into a contract may elect to
> stand by that contract and sue for damages for the fraud.  When this
> happens and the defrauding party also refuses to perform the contract as
> it stands, he commits a second wrong, and a separate and distinct cause
> of action arises for the breach of contract.  The same basic transaction
> gives rise to distinct and independent causes of action which may be
> consecutively pursued to satisfaction.

*HTP*, 685 So. 2d at 1239 (quoting *Bankers Trust Co. v. Pac. Employers Ins. Co.*, 282

F.2d 106, 110 (9th Cir. 1960)).

28.  Although truly independent claims for fraud in the inducement and negligent

misrepresentation are exempt from the application of the economic loss rule, Florida

9

courts have cautioned against applying the independent tort exception to any cause of action labeled "fraud in the inducement" without examining the nature of the cause of action to ensure that the fraud is not interwoven with the breach of contract. *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So. 2d 74, 77 (Fla. Dist. Ct. App. 1997) (concluding that cause of action was for fraud in the performance, not fraud in the inducement, and cautioning that "simply applying the label of 'fraudulent inducement' to a cause of action will not suffice to subvert the sound policy rationales underlying the economic loss doctrine."). Thus, whether a claim for fraudulent misrepresentation is barred depends upon the substance of the claim. *See id.*; *Force v. ITT Hartford Life & Annuity Ins. Co.*, 4 F. Supp. 2d 843, 852-53 (D. Minn. 1998) (applying Florida law). In other words, the inquiry turns on whether the facts reflect fraud in the inducement of the contract or fraud in the performance of the contract. *See La Pesca Grande Charters, Inc. v. Moran*, 704 So. 2d 710, 713 (Fla. Dist. Ct. App. 1998).

29. Florida courts have acknowledged that this distinction has caused a great deal of confusion among courts analyzing fraud claims under the economic loss rule. *Id.* at 712. However, several cases shed light on the distinction:

> If the fraud occurs in connection with misrepresentations, statements or omissions which cause the complaining party to enter into a transaction, then such fraud is fraud in the inducement and survives as an independent tort. However, where the fraud complained of relates to the performance of the contract, the economic loss doctrine will limit the parties to their contractual remedies.

*Allen v. Stephan Co.*, 784 So. 2d 456, 457 (Fla. Dist. Ct. App. 2000). *La Pesca* provides a helpful illustration of the distinction:

> Suppose someone offers to sell you a particular emerald for $5,000 and,

10

in order to induce you to buy it, represents to you that it is "top quality" and that it has not been filled. You buy it based on the factual representation that the stone is unfilled but later you learn that it, in fact, had been filled. If the seller knew the emerald had been filled but lied in order to trick you into agreeing to buy it, you have a cause of action for fraud with all its attendant remedies. You may also have an action for breach of contract. The fact that the same measure of damages . . . may be available under both the tort and the breach of contract does not cause the tort to disappear. **Nor does the inclusion of the fraudulent representation as an express warranty in the contract preclude the tort remedy.**

Suppose, on the other hand, on December 1, 1997, the same person enters into a contract with you pursuant to which, in exchange for your payment of $5,000, he will deliver to you on January 1, 1998 a "top quality," unfilled emerald. If, on January 1, 1998, he instead delivers an emerald that has been filled, he has only breached the contract. It is immaterial whether, when he delivered the emerald on January 1, 1998, he knew the emerald was filled. This is breach of contract pure and simple and cannot be converted into a fraud.

*La Pesca*, 704 So. 2d at 713 (emphasis added).

30. According to the Ameriseal defendants, the factual basis for RoadSafe's fraud and negligent misrepresentation claims pertains to the performance of the EPA and, therefore, those claims are barred by the economic loss rule. (D.I. 93 at 5) The Ameriseal defendants cite *HTP* in support of their contention that a claim for fraud is prohibited when the allegations of fraud are identical to the allegations of breach of contract. (D.I. 93 at 4) In response, RoadSafe contends that the economic loss rule does not apply to its fraud and negligent misrepresentation claims because the claims are independent torts. (D.I. 98 at 9) According to RoadSafe, the Ameriseal defendants' refusal to portray an accurate financial picture of Ameriseal subverted RoadSafe's ability to negotiate fair terms in the EPA and reach an informed decision in its due diligence analysis. (*Id.* at 11)

11

31.  The court concludes that the economic loss doctrine does not bar RoadSafe's claims for fraud or negligent misrepresentation because RoadSafe claims that it was induced to enter into the EPA by the misrepresentation contained in Ameriseal's financial statements, and those misrepresentations prevented RoadSafe from negotiating fair terms or making an informed decision regarding the EPA.  The facts of this case are closely analogous to the facts set forth in *Allen v. Stephan Co.*, 784 So. 2d 456 (Fla. Dist. Ct. App. 2000), in which Stephan sued the Allens for failing to accurately disclose SRP's tax liabilities in connection with the sale of the company.  In the sale contract, the Allens represented that SRP had paid its taxes and that its financial statements accurately disclosed all of its liabilities.  *Id.* at 457.  After reviewing an audit revealing that SRP owed nearly $100,000 in unpaid sales tax, Stephan asserted a claim for fraud in the inducement against the Allens, alleging that it would have negotiated a different price, would have negotiated different terms, or would not have proceeded with the transaction had it known about the outstanding tax liabilities. *Id.*  The court concluded that the fraud was not interwoven with the terms of the contract where "the representation [was] simply made and relied upon in inducing the completion of the transaction" and "[n]othing further was required of the Allens in connection with this contract term after they made the representation that all SRP's taxes had been paid."  *Id.* at 458.

32.  Similarly, the facts of the instant case reveal that the Ameriseal defendants made misrepresentations in their financial statements which led RoadSafe to believe that Ameriseal was in a superior financial position.  RoadSafe relied on these

representations in deciding to enter into the EPA, establishing the purchase price and the terms of the EPA, and expending substantial due diligence costs. (D.I. 91 at 111:8-22; Joint Ex. 130)

33. The Ameriseal defendants' efforts to portray the facts of RoadSafe's fraudulent inducement claim as being identical to the facts underlying RoadSafe's breach of contract claim fail as a matter of law. "It is no more desirable to have tort law drown in a sea of contract than to have contract law drown in a sea of tort. The notion that a knowing fraud perpetrated to induce someone to enter into a contract can be extinguished by the simple expedience of including the fraudulent representation in the contract makes no sense." *La Pesca*, 704 So. 2d at 712. As previously stated, fraud in the inducement is independent from a claim for breach of contract because the ability of one party (in this case, RoadSafe) to negotiate fair terms and make an informed decision was undermined by the Ameriseal defendants' fraudulent behavior. *See HTP*, 685 So. 2d at 1240 (quoting *Huron*, 532 N.W. 2d at 545 (internal quotations omitted)). The allegations are based on the Ameriseal defendants' conduct leading up to the execution of the EPA. Because RoadSafe alleges true claims for fraud in the inducement and negligent misrepresentation, RoadSafe's causes of action for fraud and negligent misrepresentation are not barred by the economic loss rule.

### b. Materially false statement

34. According to the Ameriseal defendants, RoadSafe failed to establish the existence of a materially false statement because nonfeasance is insufficient to establish a cause of action for fraud under Florida law. (D.I. 93 at 10) The Ameriseal

13

defendants contend that they had no common law duty or obligation to disclose underlying financial transactions because the Ameriseal defendants' obligations regarding financial disclosure were defined by the EPA.  (*Id.* at 10-11)  In response, RoadSafe contends that the Ameriseal defendants affirmatively agreed to disclose all facts necessary to ensure that every representation and warranty made to RoadSafe was true.  (D.I. 94 at 15)

35.  The court finds that Ameriseal's financial statements, which did not reflect Carter's payment of Ameriseal's corporate liabilities with personal checks or his entry into a promissory note for Ameriseal's corporate debt, constitute materially false statements or omissions.  Ameriseal's audited financial records understated liabilities and overstated income in violation of Generally Accepted Accounting Principles ("GAAP"), falsely suggesting that Ameriseal was a profitable company.  (D.I. 88 at 45:16 - 46:9, 169:12 - 170:16; D.I. 91 at 225:8-13, 234:8-17)

36.  The court rejects the Ameriseal defendants' contentions regarding their alleged lack of a duty to disclose.  "Florida law recognizes that fraud can occur by omission, and places a duty on one who undertakes to disclose material information to disclose that information fully." *ZC Ins. Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. Dist. Ct. App. 2003); *see also Gutter v. Wunker*, 631 So. 2d 1117, 1118-19 (Fla. Dist. Ct. App. 1994) ("A defendant's knowing concealment or nondisclosure of a material fact may also support an action for fraud where there is a duty to disclose.  Furthermore, where a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed.").  The Ameriseal defendants agreed to disclose

financial information in their negotiations with RoadSafe, issuing the Baker Report and responding to Bober Markey's due diligence request. As a result, the Ameriseal defendants had a duty to disclose information relating to Carter's personal payments and the promissory note. *See Nicholson v. Kellin*, 481 So. 2d 931, 936 (Fla. Dist. Ct. App. 1985) ("[E]ven assuming that a party to a transaction owes no duty to disclose facts within his knowledge or to answer inquiries respecting such facts, if he undertakes to do so he must disclose the whole truth.").

### c. Knowledge of representor

37. The Ameriseal defendants contend that RoadSafe failed to establish that the Ameriseal defendants knew the representations made in §§ 3.4.1 and 3.6.3 of the EPA were false. (D.I. 93 at 11) Specifically, the Ameriseal defendants contend that Carter relied on MSW to prepare Ameriseal's financial statements for an audit, and Carter informed MSW that he had paid for business expenses with personal funds in March of 2008. (*Id.* at 11-12) According to the Ameriseal defendants, Carter relied on his attorney and his accountant to properly advise him, but was not informed that the financial statements should not be relied upon until March of 2009. (*Id.* at 13-17)

38. In response, RoadSafe contends that the evidence presented at trial demonstrates the Ameriseal defendants' knowledge of material misstatements in Ameriseal's financial statements. (D.I. 98 at 5) Specifically, RoadSafe contends that the Ameriseal defendants were aware that Carter had made personal payments to corporate vendors and had entered into a personal note for $1.953 million in 2007, before negotiations with RoadSafe had begun. (*Id.*)

15

39. The court finds that Carter knew the representations he made to RoadSafe were false, thereby meeting the standard for fraudulent misrepresentation on this element. The evidence presented at trial shows that Carter knew Ameriseal's 2005 and 2006 internal and audited financial records were false. (D.I. 92 at 114:4-5; RoadSafe Ex. 106) Moreover, Carter knowingly withheld information regarding the promissory note and the personal payments he made on behalf of Ameriseal, and lied about his personal payments when confronted by RoadSafe with the text messages. (D.I. 92 at 116:6-13, 119:16 - 121:2; D.I. 91 at 101:20 - 102:13) In spite of his knowledge of the misrepresentations in the financial statements, Carter represented the accuracy of Ameriseal's financial data by reviewing multiple versions of the EPA without offering any edits to the provisions requiring the accuracy and veracity of those statements. (Joint Exs. 111-124 at §§ 3.4, 3.6 and 3.25)

40. Because the court concludes that RoadSafe has proven its cause of action for fraudulent misrepresentation, the Ameriseal defendants' contentions based on the theory of justifiable reliance are irrelevant. See Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010) (holding that, although justifiable reliance on a misrepresentation is required as an element of the claim of negligent misrepresentation, it is not a necessary element of fraudulent misrepresentation).

### d. Intent of representor

41. With respect to the intent element of fraud, the Ameriseal defendants contend that they did not have the requisite intent to induce RoadSafe to act on the misrepresentation by entering into the EPA. (D.I. 93 at 17) Rather, the Ameriseal

16

defendants contend that Carter did not hide the personal payments he made to vendors and willingly provided copies of the checks to RoadSafe shortly after being asked for them. (*Id.* at 17-18) Moreover, the Ameriseal defendants contend that Carter notified his accountants about the personal payments, and no evidence indicates that Carter instructed his accountants not to disclose this information to RoadSafe. (*Id.* at 18) In response, RoadSafe contends that fraud must often be proven circumstantially, and the circumstances of the instant case lend themselves to such a conclusion. (D.I. 98 at 5)

42. The court concludes that RoadSafe has established the Ameriseal defendants' intent to induce RoadSafe to enter into the EPA by a preponderance of the evidence. The fact that Carter previously shared information regarding the personal payments with HT, but withheld the same information from RoadSafe after the deal with HT fell through as a result of "unsatisfactory" due diligence, suggests that Carter intended to withhold this information to increase the likelihood of a successful deal with RoadSafe. (D.I. 92 at 113:20 - 114:3, 116:6-13; RoadSafe Ex. 106)

43. Moreover, shortly after receiving RoadSafe's request for information regarding related-party transactions, Carter approved the destruction of Ameriseal's historic accounting data. (D.I. 91 at 205:10 - 206:8, RoadSafe Ex. 10) Contrary to the Ameriseal defendants' contentions that Carter willingly disclosed all of the requested information, the timing of this destruction of data suggests that Carter sought to eliminate relevant accounting data.

44. When confronted by RoadSafe with text messages accusing Carter of making personal payments on behalf of Ameriseal, Carter further demonstrated his

17

deceptive intent by denying the accusations. (D.I. 92 at 119:16 - 121:5; D.I. 91 at 101:20 - 102:13) Despite Carter's knowledge of the misrepresentations and omissions regarding Ameriseal's financial status, Carter negotiated Ameriseal's purchase price and the deal structure personally with RoadSafe and signed the letters of intent and the EPA, indicating that he intended to deceive RoadSafe. (D.I. 92 at 104:13-105:13)

45. In light of this evidence, the Ameriseal defendants' contention that Carter did not intentionally hide the personal payments is not compelling. The court concludes that the Ameriseal defendants possessed the requisite intent to induce RoadSafe to enter into the EPA based on material misrepresentations.

### e. Injury and damages

### (1) Justifiable reliance

46. The Ameriseal defendants contend that RoadSafe cannot prove that it justifiably relied on the representations and warranties in the EPA because RoadSafe knew the representations and warranties were not true at the time the EPA was signed due to inaccuracies in the financial statements. (D.I. 93 at 19-21) Moreover, the Ameriseal defendants point out that RoadSafe continued negotiating with them even after RoadSafe learned that Carter had paid business expenses with personal funds. (*Id.* at 21)

47. The court concludes that the Ameriseal defendants' justifiable reliance contentions fail as a matter of law. The Florida Supreme Court has held that justifiable reliance is not an element of a fraudulent misrepresentation claim. *See Butler*, 44 So. 3d at 105.

### (2) Liquidated damages

48. The Ameriseal defendants further contend that RoadSafe's tort damages

must be limited to $100,000 pursuant to the EPA's liquidated damages clause, which

provides:

> [I]n the event that this Agreement shall be terminated pursuant to Section
> 10.1 hereof, all obligations of the parties hereto under this Agreement
> shall terminate and, subject to the last sentence of this Section, there
> shall be no liability of any party hereto to any other party . . . provided,
> however, that in the event of a termination of this Agreement by reason of
> either clause 10.1.4 or 10.1.5 hereof, the non-terminating party(ies) shall
> reimburse the terminating party(ies) for its (their) reasonable out-of-pocket
> expenses (which shall include legal and accounting fees, etc.), incurred
> relative to this Agreement and the transactions contemplated herein not to
> exceed One Hundred Thousand Dollars ($100,000). Notwithstanding
> anything to the contrary contained in this Section 10.2, but subject to
> Section 10.3, nothing shall relieve a party for liability related to a breach of
> this Agreement prior to termination.

(Joint Ex. 18 at § 10.2; D.I. 93 at 22-23) In response, RoadSafe contends that § 10.2 of

the EPA does not relieve the Ameriseal defendants of liability related to a pre-

termination breach. (D.I. 94 at 26-27) Moreover, RoadSafe contends that § 10.2 is

inapplicable to RoadSafe's tort claims under Delaware law. (Id. at 27)

49. The court concludes that neither § 10.2 of the EPA nor Florida law restricts

RoadSafe from pursuing tort damages that arose prior to the parties' execution of the

EPA. Section 10.2 of the EPA limits damages based on a breach of the EPA itself, but

does not contemplate tort damages that arose prior to the parties' execution of the

EPA. (Joint Ex. 18 at § 10.2) Moreover, well-settled Florida law establishes that a party

may not contractually limit liability for its own fraud. See Burton v. Linotype Co., 556

So. 2d 1126, 1127 (Fla. Dist. Ct. App. 1989). "Fraud is an intentional tort and thus not

19

subject to the cathartic effect of the exculpatory clauses found in contracts." *L. Luria & Son, Inc. v. Honeywell, Inc.*, 460 So. 2d 521, 523 (Fla. Dist. Ct. App. 1984).

50. The Ameriseal defendants cite cases premised on the economic loss doctrine in support of their proposition that RoadSafe cannot recover damages for both its tort and its breach of contract claims. However, the court previously rejected the Ameriseal defendants' proposed application of the economic loss doctrine in the instant case. *See supra* Part II.C.2.a. Therefore, the court concludes that RoadSafe may pursue both tort and breach of contract damages, and RoadSafe's tort damages are not restricted by the liquidated damages provision of the EPA.

### (3) Compensatory damages

51. RoadSafe seeks damages in the amount of $801,184.49 as compensation for the Ameriseal defendants' fraud. (D.I. 94 at 16) The record demonstrates that RoadSafe paid Blank Rome $579,000.00 to conduct legal due diligence and document drafting in connection with the Ameriseal transaction. (Joint Ex. 45; D.I. 91 at 114:11 - 116:6) RoadSafe was also contractually obligated to pay Winston & Strawn $83,636.91 for its work in connection with the transaction. (Joint Ex. 141; D.I. 91 at 116:13 - 117:19; D.I. 92 at 70:4-15) In addition to these legal expenses, RoadSafe incurred $115,407.45 in accounting expenses, including payments to Bober Markey for due diligence and forensic accounting and to Mulder & Associates for market strategy work. (Joint Exs. 42, 130; D.I. 91 at 118:1-22) RoadSafe also spent $14,140.13 in travel costs and $9,000.00 in environmental testing costs in connection with the transaction. (Joint Ex. 130; D.I. 91 at 119:17 - 120:6, 122:1 - 123:3)

52. The Ameriseal defendants dispute only the amount of RoadSafe's legal fees, contending that RoadSafe failed to establish a reasonable number of hours or a reasonable hourly rate charged by Winston & Strawn or Blank Rome under the federal lodestar approach. (D.I. 93 at 23-24) As a result, the Ameriseal defendants contend that RoadSafe should not be permitted to recover damages to compensate it for the full $662,636.91 it expended in legal fees. (*Id.*) In response, RoadSafe points to the testimony of its attorney fees expert, Doug Coopersmith, who testified that the fees and hourly rates charged by Blank Rome were fair and reasonable and that the payment to Winston & Strawn was a condition precedent to obtaining financing. (D.I. 94 at 16) According to RoadSafe, the federal lodestar approach is inapplicable to the amounts charged by Winston & Strawn because RoadSafe had no contractual discretion as to the amounts it could pay for those services. (D.I. 98 at 8 n.7)

53. The court concludes that RoadSafe has failed to prove the reasonableness of Blank Rome's attorney fees by a preponderance of the evidence. Mr. Coopersmith testified that he examined the rates charged and the number of hours expended by the Blank Rome attorneys as the two principal components of his analysis. (D.I. 92 at 56:5-9, 59:14 - 63:7) However, Mr. Coopersmith was unable to quantify a number that would have represented a reasonable number of hours for the transaction, and he did not calculate a threshold high mark or low mark. (*Id.* at 75:10 - 76:5) Moreover, Mr. Coopersmith testified that the average hourly billing rates for equity partners and paralegals were higher than the rates listed in the surveys he used in his analysis. (*Id.* at 76:6-20)

54. Mr. Coopersmith's methodology is inconsistent with the widely accepted federal lodestar method of calculating damages, in which the number of hours reasonably expended are multiplied by a reasonable hourly rate. *See Fla. Patient's Compensation Fund v. Rowe*, 472 So. 2d 1145, 1150 (Fla. 1985) (concluding that the federal lodestar approach, in which the number of hours reasonably expended are multiplied by a reasonable hourly rate, "provides suitable foundation for an objective structure."). The court finds Blank Rome's $579,000 in fees to be excessive in light of these circumstances. As such, the court shall award fees to Blank Rome in the amount of $300,000.

55. Mr. Coopersmith also testified that RoadSafe's payment to Winston & Strawn as a condition precedent to obtaining financing from the Bank of Montreal is typical in the world of mergers and acquisitions. (*Id.* at 68:19 - 69:13) Mr. Coopersmith explained that RoadSafe was legally obligated to pay the fees charged by Winston & Strawn and, therefore, he did not analyze the reasonableness of the $83,636.91 in legal fees. (*Id.* at 72:7-12) The court concludes that, because RoadSafe had no contractual discretion regarding the amounts paid to Winston & Strawn and because Mr. Coopersmith testified that such expenses are standard practice in mergers and acquisitions, application of the federal lodestar approach to those fees would be inappropriate and RoadSafe's payment of the fees was reasonable.

56. In light of the foregoing, RoadSafe shall be awarded $522,184.49 in compensatory damages caused by the Ameriseal defendants' fraud.

22

## (4) Punitive Damages

57. RoadSafe contends that it should also be awarded punitive damages because the Ameriseal defendants' actions were fraudulent, and they engaged in a knowing and willful course of conduct designed to overstate Ameriseal's value and inflate its purchase price for their own financial gain. (D.I. 94 at 17-18) Accordingly, RoadSafe requests that the court award punitive damages in the amount of $3,204,737.96, or four times RoadSafe's proposed compensatory damages. (Id. at 18)

58. In response, Ameriseal contends that RoadSafe failed to meet the high evidentiary standard for awarding punitive damages. (D.I. 97 at 10-11) Specifically, Ameriseal contends that Carter notified his accountant of the personal checks and the promissory note prior to the execution of the EPA, demonstrating a lack of intentional misconduct or gross negligence. (Id. at 11) In the alternative, Ameriseal contends that it is entitled to apportionment for comparative negligence in accordance with Fla. Stat. § 768.81(2)-(3). (Id.)

59. Under Florida law, "[p]unitive damages are appropriate when a defendant engages in conduct which is fraudulent, malicious, deliberately violent or oppressive, or committed with such gross negligence as to indicate a wanton disregard for the rights of others." W.R. Grace & Co.-Conn. v. Waters, 638 So.2d 502, 503-04 (Fla. 1994). The purpose of a punitive damages award is not to further compensate the plaintiff, but to punish the defendant for wrongful conduct and to deter similar misconduct by it and others in the future. See Myers v. Cent. Fla. Invs., Inc., 592 F.3d 1201, 1216 (11th Cir. 2010) (quoting Owens-Corning Fiberglas Corp. v. Ballard, 749 So. 2d 483, 486 (Fla.

23

1999)).

60. RoadSafe must demonstrate the appropriateness of a punitive damages award by clear and convincing evidence. Fla. Stat. § 768.725 (2010). If RoadSafe is able to establish that punitive damages are appropriate, the court must then determine the appropriateness and size of the award by determining the amount that "would best serve the public policy of punishment and deterrence." *St. Regis Paper Co. v. Watson*, 428 So.2d 243, 247 (Fla. 1983) (citations omitted). Unless RoadSafe establishes the Ameriseal defendants' specific intent to harm, punitive damages may not exceed the greater of: (1) three times the amount of compensatory damages awarded to each claimant; or (2) the sum of $500,000. Fla. Stat. § 768.73(1)(a)1-2 (2010). If the court determines that the wrongful conduct "was motivated solely by unreasonable financial gain and determines that the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by" the Ameriseal defendants, the court may award punitive damages not to exceed the greater of: (1) four times the amount of compensatory damages awarded to each claimant; or (2) the sum of $2,000,000. *Id.* at § 768.73(1)(b)1-2.

61. The court previously concluded that the Ameriseal defendants knowingly misrepresented their financial statements to overstate Ameriseal's value and inflate its purchase price. *See supra* Part II.C.2.b-d. The Ameriseal defendants' behavior was motivated by unreasonable financial gain and gave rise to a high likelihood that RoadSafe would be financially injured due to its lack of information in negotiating the terms of the sale. Moreover, apportionment of punitive damages is inapplicable where,

as here, the Ameriseal defendants committed fraud as opposed to negligence. *See*
Fla. Stat. § 768.81(2)-(3). However, the court concludes that awarding the full amount
of punitive damages in this case is not necessary to achieve the public policy goals of
punishment and deterrence. Instead, the court shall award punitive damages in the
amount of $522,184.49.

## D. Breach of Contract

### 1. Legal standard

62. Under Delaware law, the elements of a breach of contract claim are: (1) a
contractual obligation; (2) breach of that obligation by the defendant; and (3) resulting
damage to plaintiff. *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch.
2003). The parties concede that the EPA is a contractual obligation and that damages
for its breach are capped at $100,000.00, exclusive of reasonable attorney fees and
costs. (D.I. 79 at § III(CC)) Based on the record evidence, the court finds that
RoadSafe has satisfied each of the elements to establish the Ameriseal defendants'
breach of the EPA, but the Ameriseal defendants have failed to establish a breach of
contract by RoadSafe.

### 2. RoadSafe's claim against the Ameriseal defendants

63. In support of its claim for breach of contract, RoadSafe contends that the
Ameriseal defendants breached §§ 3.4, 3.6, 3.22 and 3.25 of the EPA by supplying
inaccurate financial statements, failing to disclose the promissory note and failing to
disclose Carter's personal checks. (D.I. 94 at 29)

64. The Ameriseal defendants do not contest the evidence cited by RoadSafe in

support of its breach of contract claim. Instead, the Ameriseal defendants contend that RoadSafe waived any claim it had under the representations and warranties provisions of the EPA because it knew that Ameriseal's audited financial statements were not accurate and signed the EPA with that knowledge. (D.I. 93 at 32) Specifically, the Ameriseal defendants cite the testimony and emails of RoadSafe's CFO, Alan Sobel, and Khuyn Park, a RoadSafe board member, who admitted that they were aware of an inaccuracy in Ameriseal's financial statements. (Joint Exs. 28, 30-39; D.I. 91 at 145:16-25; D.I. 92 at 155:17 - 156:1, 166:3-8, 167:14-17, 174:21 - 176:3) Moreover, the Ameriseal defendants contend that RoadSafe's attorneys prepared a closing checklist contemplating that the Ameriseal defendants would indemnify RoadSafe for any damages incurred as a result of the personal checks. (Joint Ex. 50; D.I. 92 at 45:15 - 46:13)

65. In response, RoadSafe contends that it could not verbally waive the deficiencies in the Ameriseal defendants' financial statements because the plain language of the EPA requires that all modifications to the agreement must be made in writing. (D.I. 94 at 30) Specifically, RoadSafe points to § 11.8 of the EPA, which mandates that any waiver of an EPA representation and warranty must be reduced to writing. (*Id.*)

66. The court concludes that the Ameriseal defendants breached the EPA. Specifically, Carter admitted that the 2005 and 2006 Ameriseal financial statements were incorrect, resulting in a breach of §§ 3.4 and 3.6 of the EPA, which mandate the preparation of audited financial statements in accordance with GAAP. (Joint Ex. 18 at

§§ 3.4, 3.6; D.I. 92 at 114:6 - 115:16)  Other record evidence demonstrates that

Ameriseal's internal and audited financial statements for 2005, 2006 and 2007 were not

prepared in accordance with GAAP.  (D.I. 88 at 45:16 - 46:9, 169:12 - 170:17; D.I. 91 at

225:8-11, 234:8-18)  This same evidence also supports RoadSafe's claim that the

Ameriseal defendants breached § 3.25 of the EPA , which warrants against the

omission of any fact that would make any representation or warranty false or

misleading.  (Joint Ex. 18 at § 3.25)

67.  The Ameriseal defendants also breached § 3.22 of the EPA, which warrants

that there are no "loans, guarantees, Contracts, transactions, understandings or other

arrangements of any nature between or among the Companies . . . or any other Person

affiliated with the Companies."  (Joint Ex. 18 at § 3.22)  The evidence presented at trial

indicates that the Ameriseal defendants failed to disclose the $1.953 million Ennis Paint

note or the $750,000.00 payment Ameriseal Northeast made to Carter for the personal

payment to Ennis Paint.  (Joint Ex. 24; D.I. 92 at 141:16-19; D.I. 92 at 113:2-19)

68.  The court further concludes that the Ameriseal defendants failed to establish

RoadSafe's waiver of the deficiencies in Ameriseal's audited financial statements.  The

EPA specifies that any waiver of an EPA representation and warranty must be reduced

to writing:

> Except as otherwise expressly provided herein, no waiver with respect to
> this Agreement shall be enforceable unless in writing and signed by the
> party against whom enforcement is sought.  Except as otherwise
> expressly provided herein, no failure to exercise, delay in exercising, or
> single or partial exercise of any right, power or remedy by any party, and
> no course of dealing between or among any of the parties, shall constitute
> a waiver of, or shall preclude any other or further exercise of, any right,
> power or remedy.

(Joint Ex. 18 at § 11.8) The Ameriseal defendants have not presented a written, signed waiver of the EPA's representations and warranties clauses in support of their contention that RoadSafe knew Ameriseal's audited financial statements were not accurate and signed the EPA with that knowledge. The evidence presented at trial suggests that, although such a waiver was contemplated on the checklist, a draft of the waiver of those representations and warranties was never prepared or signed. (Joint Ex. 50; D.I. 92 at 46:8-13)

### 3. The Ameriseal defendants' claim against RoadSafe

69. In support of their breach of contract claim against RoadSafe, the Ameriseal defendants contend that RoadSafe committed a material breach of the EPA by terminating the agreement despite its prior knowledge that the audited financial statements were inaccurate. (D.I. 93 at 32) The Ameriseal defendants also allege that RoadSafe breached the EPA by failing to close by February 15, 2009 in accordance with § 10.1.2 of the EPA. (*Id.* at 32-33) As a consequence of RoadSafe's failure to close, the Ameriseal defendants claim they should be awarded a $500,000.00 termination fee pursuant to § 10.3 of the EPA. (*Id.* at 33)

70. In response, RoadSafe contends that its contractual obligations were excused following the Ameriseal defendants' breach of multiple representations and warranties. (D.I. 94 at 38)

71. The court concludes that RoadSafe's actions did not constitute a material breach of the EPA. Delaware law provides that "[a] party is excused from performance under a contract if the other party is in material breach thereof." *BioLife Solutions, Inc.*

28

*v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003). In this case, the Ameriseal defendants were in breach of the representations and warranties provisions of the EPA from the moment the agreement was signed, and RoadSafe terminated the agreement as a result of the Ameriseal defendants' material misrepresentations.[5] RoadSafe's termination of the EPA was justified in light of the Ameriseal defendants' material breach and, therefore, the Ameriseal defendants cannot prevail on their cause of action for breach of contract against RoadSafe.

### E. Account Stated

#### 1. Legal standard

72. To prove a claim for account stated under Florida law, a plaintiff must prove by a preponderance of the evidence that: "(1) there was an agreement between the parties that a certain open account balance is due, and (2) there was an express or implicit agreement to pay that balance." *Wallace Int'l Trucks, Inc. v. Magruda Trucking Co., LP*, 2007 WL 842146, at *11 (M.D. Fla. Mar. 20, 2007) (applying Florida law); *Myrick v. St. Catherine Laboure Manor, Inc.*, 529 So. 2d 369, 371 (Fla. Dist. Ct. App. 1988).

#### 2. Discussion

73. According to RoadSafe, Ameriseal Northeast owes RoadSafe $35,941.00 in unpaid goods and services. (D.I. 94 at 32) (Joint Ex. 128-29; D.I. 91 at 130:9-12) Specifically, RoadSafe contends that Ameriseal Northeast stopped paying its bills for

---

[5]The court has previously determined that the Ameriseal defendants' misrepresentations were material. *See supra* Part II.C.2.b.

safety equipment used in connection with a project after RoadSafe received the first
anonymous text message. (Id.) RoadSafe presented proof of Ameriseal Northeast's
eighteen unpaid invoices totaling $20,511.00. (D.I. 91 at 127:19 - 128:16; Joint Ex.
128) RoadSafe contends that, at Ameriseal Northeast's instruction, it switched
Ameriseal Northeast's outstanding account to Ameriseal C&J, which also failed to pay
the invoices. (D.I. 91 at 128:18 - 129:21; D.I. 92 at 95:2-17) RoadSafe submitted
eleven additional invoices to Ameriseal C&J for services provided to Ameriseal
Northeast, with an outstanding balance in the amount of $14,980.00. (Joint Ex. 129;
D.I. 91 at 130:2-8)

74. The Ameriseal defendants offer no factual defenses to RoadSafe's claims,
but instead allege that this court lacks jurisdiction to resolve the issue. (D.I. 91 at
125:15-20) Specifically, the Ameriseal defendants contend that RoadSafe's claims for
account stated do not arise out of the EPA and, therefore, the forum selection clause
found in § 11.14 of the EPA does not apply. (D.I. 93 at 30-31) The Ameriseal
defendants further contend that no testimony was given at trial to establish that they
had sufficient contacts with Delaware to establish personal jurisdiction. (Id. at 31) If the
court concludes that it has jurisdiction over the claims, the Ameriseal defendants
contend that liability should only extend to the entity that was invoiced because
RoadSafe failed to establish that it resubmitted any invoices after it learned that it had
billed the wrong entity in error. (Id.)

75. The EPA's forum selection clause reads as follows:

In any action between or among any of the parties, whether arising out of
this Agreement, any of the agreements contemplated hereby or otherwise,
(a) each of the parties irrevocably consents to the exclusive jurisdiction

30

> and venue of the federal and state courts located in the State of Delaware
> . . .

(Joint Ex. 18 at § 11.14) The court concludes that this forum selection clause, which

expressly provides that it applies to actions between the parties arising out of "any of

the agreements contemplated hereby or otherwise," is not limited to transactions arising

out of the EPA. (*Id.*) Therefore, the court concludes that the forum selection clause in

§ 11.14 of the EPA applies to RoadSafe's cause of action for account stated.

76. Moreover, the court concludes that it may exercise supplemental jurisdiction

over RoadSafe's claim for account stated. According to 28 U.S.C. § 1367(a),

> [i]n any civil action of which the district courts have original jurisdiction, the
> district courts shall have supplemental jurisdiction over all other claims
> that are so related to claims in the action within such original jurisdiction
> that they form part of the same case or controversy under Article III of the
> United States Constitution.

At trial, RoadSafe established that it began doing work together with the Ameriseal

defendants before the deal closed as part of the ongoing acquisition discussions. (D.I.

91 at 124:21 - 125:11) Specifically, Khuyn Park, a RoadSafe board member, testified:

> [T]he nature of pavement marking, you know, when you are painting the
> line, you have to close down the lane and you're supposed to put up
> safety equipment, which is a business that, you know, RoadSafe
> performed. So operational people at both RoadSafe and Ameriseal were
> put in touch, and then Ameriseal effectively became a customer of RoadSafe, in which
> RoadSafe provided those traffic safety services for Ameriseal's business.

(*Id.* at 125:3-11) In the midst of the EPA negotiations, it logically follows that the

Ameriseal defendants would choose to do business with RoadSafe instead of obtaining

services from one of RoadSafe's competitors. In this respect, the transactions

underlying RoadSafe's account stated claim are sufficiently related to RoadSafe's other

claims to support this court's exercise of supplemental jurisdiction.

31

77.  Having established its jurisdiction over RoadSafe's account stated claim, the court shall enter judgment in the amount of $35,941.00 in favor of RoadSafe and against Ameriseal Northeast.  At trial, RoadSafe established that it incorrectly transferred some of Ameriseal Northeast's invoices to Ameriseal C&J, despite the fact that the services were provided to Ameriseal Northeast.  (D.I. 91 at 128:18 - 130:8) Because no evidence was presented indicating that RoadSafe provided services to Ameriseal C&J with respect to this transaction, the court concludes that recovery against Ameriseal C&J is not appropriate.

## III. CONCLUSION

For the foregoing reasons, the court concludes that the Ameriseal defendants fraudulently misrepresented their financial statements and breached the EPA. Judgment shall be entered in favor of RoadSafe and against the Ameriseal defendants in the amount of $1,044,368.98 with respect to RoadSafe's claims of fraud and breach of contract.  Moreover, judgment shall be entered in favor of RoadSafe and against Ameriseal Northeast in the amount of $35,941.00 with respect to RoadSafe's claim for account stated.  An appropriate order shall issue.